UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ELBERT C. GROVE,

        Plaintiff,

        v.                              Case No. 19-C-1183

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

---

### DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

---

      Plaintiff Elbert Grove filed this action for judicial review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits and supplemental social security income under Titles II and XVI of the Social Security Act. Grove contends that the administrative law judge's (ALJ) decision is flawed and requires remand because: (1) the ALJ's rejection of medical opinions by Drs. Ssempijja and Ruta was not supported by substantial evidence and (2) the hypothetical posed to the vocational expert (VE) was not consistent with the ALJ's assessment of Grove's residual functional capacity (RFC), thus undermining the VE's testimony as to Grove's ability to find suitable work. For the reasons that follow, the Commissioner's decision will be affirmed.

### BACKGROUND

      Grove filed his initial application for disability insurance benefits on March 24, 2014, alleging disability beginning September 16, 2013, at which time he would have been 36 years old. R. 328–34. He subsequently applied for supplemental security income on March 27, 2014. R. 335–40. He listed high blood pressure, diabetes, high cholesterol, depression, and back and

neck pain as conditions limiting his ability to work. R. 408. After a hearing, the ALJ issued an unfavorable decision on March 16, 2017, that was vacated and remanded by the Appeals Council for further reconsideration of the medical opinions and Grove's maximum RFC. R. 163–73, 179–81. On October 18, 2018, the ALJ conducted a second hearing during which Grove, who was represented by counsel, and VE Les Goldsmith testified. R. 13.

At the time of the 2018 hearing, Grove was 41 years old and living with his wife and younger children in a two-level rented home. R. 40, 45–50. Grove had completed three-and-a-half years of college and, prior to becoming disabled, worked at various positions doing general labor, including as a forklift driver, materials handler, and machine operator. R. 42–45. He last worked in 2014 at Chicago Tubes doing general labor, and he stopped working because of diabetic complications. R. 45. Grove testified that employers would not let him work because his A1C level was 16 and he was vulnerable to passing out unexpectedly or going into a diabetic coma. *Id*. At the time he stopped working, Grove was 420 pounds. R. 46. Grove testified that his wife currently supports him, and he has health insurance through the state. R. 45–46.

During the hearing, Grove testified that he had undergone gastric bypass surgery and was down to 265 pounds. R. 46–47. He was continuing to work on his weight loss so that he could get a knee replacement, and he was getting injections in his knees every three months. *Id.* He described that the weight was still pushing on his knees and feet, his ankles were frequently swollen, and he had arthritis in his back. R. 47. He also testified that he had a pinched nerve in his neck. *Id*. Grove stated that if he sits for too long, his legs and feet get numb, but that when he walks, his knees could buckle and give out at any time. R. 47–48. Grove noted that his pain medication makes him drowsy, and therefore he cannot drive or "do the activities I want to do." R. 48.

Grove testified that he rides an exercise bike two to three minutes per day to move his legs and keep them from getting stiff. R. 49. When he is riding the bike, his wife sometimes massages his legs and ankles. *Id*. Grove stated that when it is warm, he uses a walker to take walks with his wife to further his weight loss efforts. R. 49–50. Grove testified that, although he cannot participate in his son's football practices, he attends his games. R. 50. He described how his limitations due to the pain and his fear of falling make him depressed, and stated his wife attempts to motivate him and force him to do more. R. 51. He discussed how he was on three types of pain medication for his knees and back and was unable to help much around the house but would sit in his walker and talk to his wife while she was cooking and cleaning. *Id*.

The ALJ then asked Grove about his medical care and ongoing medical issues. R. 51–53. Grove described how he uses a cane because of his "fear of falling," and also has knee and back braces and a walker. R. 52–53. Although Grove testified that he experiences numbness in his hands and swelling in his ankles, the ALJ noted that Grove had no reported symptoms of neuropathy when preparing for surgery. R. 53. The ALJ also noted that one of Grove's doctors, Dr. Brooks, had taken him to task for not being more active. R. 54–55. Grove acknowledged that discussion, but responded that when he tried to exercise, his ankles and knees would swell up and his pain increased. R. 54. Grove testified that his wife also tried to motivate him to do more, but that the pain felt like someone was hitting him with a hammer and that it was sometimes hard to deal with. R. 55–56.

In a fifteen-page decision dated February 13, 2019, the ALJ concluded that Grove was not disabled from September 2013 to the date of his decision. R. 13–27. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ found that Grove met the insured status requirements

3

of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since September 16, 2013, the alleged onset date.  R. 15.  At step two, the ALJ determined that Grove had the following severe impairments: diabetes mellitus; degenerative joint disease; degenerative disc disease; clinical obesity; depressive disorder; anxiety disorder with panic attacks; post-traumatic stress disorder (PTSD); and substance abuse in remission.  R. 16.  At step three, the ALJ found that Grove did not have an impairment or combination of impairments that met or substantially equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id*.

Next, the ALJ determined that Grove had the RFC to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that

> he must be allowed to use an assistive device to ambulate.  He also is limited to unskilled work performing simple, routine and repetitive tasks; with individually performed work tasks; only occasional changes in his work setting, interaction with coworkers, and decision making; and no interaction with the public.

R. 18.  During the hearing, the ALJ asked the VE whether a person of claimant's age, education, and work experience, "who can work at the sedentary level and needs to have a cane to ambulate" could perform Grove's past work.  R. 64.  The VE responded "no."  R. 65.  The ALJ then asked the VE whether there were other sedentary jobs that such an individual could perform, to which the VE responded that there were jobs as assemblers, packagers, or surveillance monitors.  *Id*.  The VE testified that if the individual were going to be off task for 15 percent of the workday in addition to regular breaks, those jobs would be eliminated.  *Id*.

At step four, the ALJ found that Grove would be unable to perform any past relevant work as a warehouse/material handler.  R. 26.  However, at step five, the ALJ concluded that, based on the testimony of the VE and considering Grove's age, education, and RFC, Grove would be capable of successfully adjusting to other work existing in significant numbers in the national

4

economy. R. 26–27. The ALJ determined that Grove was not disabled under the Social Security Act. R. 27. The Appeals Council denied Grove's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the

burden of proof; a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence that the claimant is able to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 615 F.3d 744, 749 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556

6

F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Assessment of Medical Opinions

Grove argues that the ALJ failed to properly evaluate the opinions of his mental health providers, Dr. Sebastian Ssempijja and Dr. Peter Ruta. Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Burmester*, 920 F.3d at 512; 20 C.F.R. § 416.927(c)(2); SSR 96-2p. If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). In other words, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it."

7

*Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

**1. Dr. Ssempijja**

In January 2017, Dr. Ssempijja, a consulting psychologist, completed a confidential mental status summary at Grove's request. R. 1727–29. In the letter, Dr. Ssempijja noted that Grove had been a psychotherapy patient at his clinic on-and-off since March 31, 2014, and received psychotherapy and supportive services. R. 1727. He stated that Grove had been a diligent and reliable client under the care of Dr. Ruta, whom he supervised, and was examined by a psychiatrist, Dr. Hillary Wynn, for management of his severe depression and PTSD. R. 1727–28. Dr. Ssempijja noted that Grove was diagnosed with a generalized anxiety disorder with panic attacks, remarkable for his restlessness, being easily fatigued, muscle tension, sleep disturbances, excessive worry, physiological symptoms, and panic attacks. He also indicated that Grove meets the criteria for PTSD. He explained that Grove's early childhood adverse experiences, namely, witness to the murder of a loved one, and a range of psychological challenges that he experienced caused clinical significance and justified the diagnosis. Dr. Ssempijja also noted that, along with the PTSD, Grove experiences moments when he is disassociating, experiences derealization, and experiences sleep apnea. Medications were attempted to manage his depression, anxiety with panic disorders, and sleep apnea. R. 1728. Dr. Ssempijja stated that Grove's medications are "diligently utilized" and that the Clinic is confident that he was incompliance with his medications. R. 1727. Dr. Ssempijja reported that Grove's response to the psychotherapy and other psychiatric interventions was slow

and complicated by the complexity of his symptoms. He noted that Grove's employment history in terms of motivation, compliance, and productivity was unremarkable until he got very sick. R. 1728.

Dr. Ssempijja opined that, for current purposes, Grove's "medical condition has continued to deteriorate to the point where he appears to be unable to participate in any meaningful, gainful work at this time." *Id.* He indicated that the prognosis that Grove's psychiatric condition remains poor given his complexity. *Id.* Dr. Ssempijja recommended that Grove continue to participate in supportive therapy, that he comply with the range of medications both for his physical needs and his psychiatric needs, and that he utilize the support of a psychosocial program, such as Community Comprehensive Services, available through Milwaukee County programs. R. 1729. Dr. Ssempijja deferred to physical health providers with respect to Grove's physical ability to work. R. 1728.

The ALJ sufficiently articulated his reasons for giving Dr. Ssempijja's January 2017 opinion little weight. The ALJ explained that, while Dr. Ssempijja is a "highly trained mental health provider, his assertion that the claimant cannot work infringes on a matter reserved for the commissioner." R. 25. The regulations reserve to the Commissioner "the *final* responsibility for deciding residual functional capacity (ability to work—and so whether the applicant is disabled)." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because [his] physician states that [he] is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat [him], decides whether a claimant is disabled."). While the fact that a treating physician intrudes on an issue reserved to the Commissioner is not a reason to disregard the opinion entirely, the ALJ did not disregard Dr.

9

Ssempijja's opinion. Instead, he gave the opinion little weight, reasoning that Dr. Ssempijja's letter failed to address Grove's extensive alcohol abuse and that his conclusion that Grove cannot work is contradicted by the objective treatment notes. R. 25.

Grove argues that the ALJ improperly "cherry-picked" evidence from the record, favoring cursory physician's notes over Dr. Ssempijja's assessment. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. But an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations omitted).

In this case, the ALJ did not only discuss records that supported a rejection of Dr. Ssempijja's opinion. The ALJ noted, regarding Grove's mental health, that Grove endorsed a history of abuse with resulting nightmares and trouble controlling his impulses, sadness, hopelessness, emptiness, uncontrolled crying, trouble with his sleep and appetite management, extreme fatigue and lethargy, suicidal ideation at times, difficulty concentrating, concerns with feeling tense and anxious most of the time, panic attacks, irritability, and anger. R. 20. The ALJ noted that Grove evidenced being sad, frustrated, angry, and having a tearful as well as dysphoric affect at 2014 treatment evaluations. *Id.* (citing R. 596–97, 669, 675, 681, 705). He also recognized that Grove needed a six-day hospitalization in January and February 2015 for depression with anxiety, suicidal ideation, and psychotic features and that Grove reported he had a panic attack in March 2015 and increased anxiety in April 2015. *Id.* (citing R. 786, 845, 876). The ALJ observed that Grove demonstrated a flat affect during examinations in March through May 2015 and required a second hospitalization for three days in July 2015 after not taking his medication, drinking to intoxication, and having suicidal ideation. *Id.* (citing R. 846, 894, 908,

10

958–59). The ALJ noted that, in January 2016, Grove asserted he had not been taking his mental health medication for approximately the past six months, and in May 2016, he continued to indicate that his symptoms were not under control. *Id.* (citing R. 1066, 1150).

The ALJ then explained that, once medication was restarted, Grove reported he was happy with his anxiety and depression control by August 2016; demonstrated a normal mood, affect, and behavior in September 2016; and reported an improved mood and rare anxiety attacks with sobriety in October 2016. R. 25. The ALJ observed that Grove continued to present with normal mood, affect, and behavior during treatment visits in 2017 and that treatment notes document Grove looking after his disabled sister, exercising a lot, and caring for his children. R. 22. He noted that, in December 2017, Grove was alert and had normal grooming, engaged attitude, intact associations, fair insight and judgment, as well as no suicidal ideations or delusions, and in 2018, treatment notes continued to document that Grove had normal psychological findings and was involved with his son's football. R. 22–23.

Grove specifically highlights exam notes from Dr. Grindell as an example of the ALJ's aggressive cherry-picking. He claims that the ALJ ignored the portions of the note that state Grove's "mood and anxiety are up and down" and that his patient health questionnaire (PHQ) score "increased significantly." Pl.'s Br. at 22, Dkt. No. 20. But Grove is doing some cherry-picking of his own. Dr. Grindell actually qualifies the highlighted findings by saying, "[i]n regards to depression and anxiety, [Grove] *is very happy with where things stand*. Unfortunately, his PHQ increased *a little bit* from 7 to 10. . . . He reports that his mood and anxiety are up and down but *currently he is doing well*." R. 1277 (emphasis added). Dr. Grindell's statement, taken as a whole, does not belie the ALJ's summary. Nor does it refute the resulting conclusion, which is that the longitudinal record showed that Grove was improving. Grove points out that other mental health

11

providers supported Dr. Ssempijja's finding that Grove had ongoing mental health issues. While that is true, those findings do not refute the ALJ's determination that Dr. Ssempijja's conclusion that Grove cannot work found no support in the medical evidence. The ALJ properly noted the findings in many treatment notes and concluded those notes could not be squared with Dr. Ssempijja's extreme conclusion. Grove's "cherry-picking" argument is thus unavailing.

Grove also asserts that the ALJ did not explain how his ability to look after his disabled sister or make sure that his kids go to school contradicted Dr. Ssempijja's opinion. While an ALJ cannot place "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006), the ALJ did not equate Grove's ability to perform these activities with the ability to work full-time. Instead, the ALJ referred to these activities as an additional ground for finding that Dr. Ssempijja's opinion was inconsistent with the record as a whole. The ALJ did not err in considering Grove's activities in addition to the other evidence in the record when assessing the weight to give Dr. Ssempijja's opinion.

Grove further attacks the ALJ's discounting of Dr. Ssempijja's opinion due to his failure to address Grove's alcohol abuse in his findings as arbitrary and unreasonable because Grove stopped using alcohol nearly a year before the date of the letter. Grove maintains that the ALJ invoked "the alcohol use in order to merely insinuate that Mr. Groves [sic] is somehow unworthy of receiving disability insurance payments." Pl.'s Br. at 20. But that is not what the ALJ did. Instead, the ALJ concluded that Dr. Ssempijja's opinion about Grove's ability to work was inconsistent with the evidence in the record that showed Grove's symptoms improved with sobriety. The ALJ noted that, although Grove's mental health symptom control was negatively affected by his heavy daily alcohol consumption and being off medication from the middle of 2015

12

to February 2016, a review of the record showed that Grove had good control of his mental health conditions once he was sober from alcohol and compliant with medication. R. 22–23. Grove also contends that the treatment notes show that he continued to have cognitive dysfunction and emotional instability even after he resumed taking his medication, thus undermining the ALJ's "theory of dramatic recovery" once he restarted his medication. Pl.'s Br. at 21. But the ALJ did not conclude that Grove was fully recovered or that he was symptom-free, only that he was able to work. *See* R. 21 ("Because of the claimant's mental health conditions and substance abuse with resulting mild to moderate paragraph B limitations . . . ."). Grove argues that the ALJ was required to ask him about his noncompliance before rejecting his doctors' opinions. Although an ALJ must ask about the reasons a claimant was noncompliant with medication when evaluating the claimant's credibility, the ALJ can consider a claimant's noncompliance when analyzing whether an opinion is consistent with the evidence in the record. *See Roddy*, 705 F.3d at 636. The ALJ considered all of the relevant evidence and built a logical bridge from the evidence to his conclusion. *See Denton*, 596 F.3d at 425. For these reasons, the ALJ did not err in giving Dr. Ssempijja's opinion little weight.

### 2. Dr. Peter Ruta

Although referred to as Dr. Ruta, it appears that Peter Ruta holds neither a Ph. D. nor an M.D. but is a therapist at Dr. Ssempijja's clinic. R. 1761. In any event, Dr. Ruta provided therapy to Grove under Dr. Ssempijja's supervision and completed a Mental Impairment Questionnaire in December 2016. R. 1721–26, 1727. Dr. Ruta noted that he saw Grove one to two times per month, and weekly prior to that, with gaps in care due to insurance disruptions or family crises. R. 1721, 1761. Grove's treatment goals were to manage his medical complexities; manage his depression, anxiety, and panic attacks; and deal with his severe grief over his parents' deaths. *Id*. Dr. Ruta

noted that he was unable to conduct a psychological evaluation of Grove's IQ due to insurance limitations. He stated that Grove was "clinically distressed by depression, [had] anxiety w[ith] panic attacks, PTSD, and sleep apnea," with a fair to guarded prognosis, but that Grove was vulnerable to permanent impairment. *Id*.

Dr. Ruta checked boxes on the form indicating that, with respect to the mental abilities and aptitude needed to do unskilled work, Grove had limited but satisfactory ability to understand and remember very short and simple instructions, carry out very short and simple instructions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precaution. R. 1724. He also checked boxes indicating that Grove had no useful ability to function in the following areas: remember work-like procedures; maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict, tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; and deal with normal work stress. *Id.* In an effort to explain these findings, Dr. Ruta noted that Grove "has not had a job for a long time. He functioned well until his health got worse. Medical and psychological barriers are still too high." *Id.*

With respect to the mental abilities and aptitude needed to do semiskilled and skilled work, Dr. Ruta checked boxes on the form indicating that Grove had no useful ability to function in the following areas: understand and remember detailed instructions, carry out detailed instructions, set

14

realistic goals or make plans independently of others, and deal with stress of semiskilled and skilled work. *Id.* With respect to the mental abilities and aptitude needed to do particular types of jobs, Dr. Ruta checked boxes indicating that Grove had the limited but satisfactory ability to interact appropriately with the general public and maintain socially appropriate behavior and that Grove had no useful ability to adhere to basic standards of neatness and cleanliness, travel in an unfamiliar place, and use public transportation. R. 1725. Dr. Ruta commented that "the items don't properly solicit for what he is able to do. Nevertheless, he is not ready for employment due to his limitations." *Id.*

As to Grove's functional limitation, Dr. Ruta checked boxes indicating that Grove had marked limitations in restrictions of daily living; had marked limitations in difficulties maintaining social functioning; had constant deficiencies of concentration, persistence, or pace; and would have four or more repeated episodes of decompensation, each of extended duration. *Id.* Dr. Ruta checked a box indicating that Grove had a medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support and repeated episodes of decompensation, each of extended duration. *Id.*

Dr. Ruta noted that, on average, Grove would be absent from work more than four days per month and that Grove's impairment lasted or can be expected to last at least twelve months. R. 1726. He indicated that Grove would have difficulty working at a regular job on a sustained basis as a result of "multiple etiologies due to both physical and psychiatric needs." *Id.*

The ALJ gave little weight to Dr. Ruta's opinion. The ALJ acknowledged that Dr. Ruta is a highly trained mental health provider who personally observed and examined Grove, factors

15

Case 1:19-cv-01183-WCG   Filed 03/25/21   Page 15 of 18   Document 23

which generally increase the persuasiveness of his assertions. But the ALJ concluded that Dr. Ruta's assertions are not supported or consistent with the overall record, which outweigh these factors. He explained that Dr. Ruta failed to mention Grove's longstanding alcohol abuse for over ten years and his noncompliance with medication in his opinion and that Dr. Ruta relied on a check-the-box form with no attached objective treatment notes. The ALJ also reasoned that Dr. Ruta's claims are belied by the objective record. R. 25.

Grove again asserts that the ALJ erred in discounting Dr. Ruta's opinion based on his failure to address Grove's alcohol abuse and Grove's non-compliance with medication. The Court rejects these arguments for the reasons stated above. Grove also criticizes the ALJ for discounting Dr. Ruta's opinion because he did not attach objective treatment notes to the opinion. Section 404.1527 states, "The more a medial source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). In this case, Dr. Ruta neither cited to any treatment notes that supported his extreme limitations nor alluded to any specific objective clinical findings to support the conclusions. It was therefore not improper for the ALJ to explain that this was one reason he assigned little weight to Dr. Ruta's opinion. The ALJ's decision to assign little weight to Dr. Ruta's opinion was reasonable and supported by substantial evidence.

**B. RFC and Hypothetical Question Posed to the VE**

Grove contends that the hypothetical question posed to the VE did not fully align with Grove's RFC regarding his need for an assistive device and therefore the VE could not accurately identify jobs that accounted for all of Grove's limitations. "As a general rule, both the hypothetical

16

Case 1:19-cv-01183-WCG   Filed 03/25/21   Page 16 of 18   Document 23

posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

> [A]n ALJ must explicitly address [a claimant's RFC] limitations in the hypothetical unless one of three exceptions applies: (1) the vocational expert was independently familiar with the claimant's medical file; (2) the hypothetical adequately apprised the vocational expert of the claimant's underlying medical conditions; or (3) the hypothetical otherwise accounted for the limitations using different terminology.

*Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017).

The ALJ assessed Grove as having the RFC to perform sedentary work where "he must be allowed to use an assistive device to ambulate." R. 18. The ALJ determined that Grove has "degenerative joint disease in his right knee and tendonitis in his left knee" and that he "has used a cane and a wheeled walker to help him ambulate." R. 20. The ALJ concluded:

> Due to a combination of the claimant's severe and nonsevere physical impairments, the undersigned finds he is unable to sustain the standing or walking requirements of light or greater exertional work and is therefore limited to sedentary work. Given his history of falls, he also requires the use of an assistive device to ambulate.

*Id.* During the October 2018 hearing, the ALJ posed to the VE the hypothetical involving a person of claimant's age, education, and work experience, "who can work at the sedentary level and needs to have a cane to ambulate. . . ." R. 64.

Grove maintains that he uses a four-point walker as an assistive device, and therefore, he could not necessarily do jobs that could be performed with a cane. Pl.'s Br. at 29. The ALJ recognized that the record documents treating providers suggesting that Grove use a four-wheeled walker for longer distances, as Grove reported falling on multiple occasions using a cane. But the ALJ concluded that the overall record does not support Grove having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities. The ALJ observed that the objective evidence does not support insufficient lower extremity functioning as diagnostic imaging of his knees shows

17

no more than mild degenerative joint disease and that Grove exhibited 4-5/5 strength in his lower extremities, which improved with physical therapy. In addition, the ALJ noted that Grove has appeared at numerous treatment visits, both before and after a treating provider recommended that he use an assistive device, with a normal gait despite not using an assistive device. R. 16.

The ALJ fully explained why he determined that, while Grove was limited to sedentary work with the use of an assistive device to ambulate, he did not have insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities. The hypothetical accurately accounted for the RFC limitation requiring the use of an assistive device, i.e., a cane. *See Lanigan*, 865 F.3d at 565. In sum, the ALJ did not err in formulating the RFC or hypothetical question posed to the VE.

## CONCLUSION

For these reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of March, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge